# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

In the Matter of:                           }
                                            }
VERILINK CORPORATION,                       }     CASE NO. 06-80566-JAC-11
                                            }
                                            }     CHAPTER 11
                     Debtor(s).             }

DARRYL S. LADDIN, as Trustee for the        }     AP NO. 08-80072-JAC-11
Liquidating Trust of the Estates of Verilink }
Corporation and Larscom Incorporated,       }
                                            }
                     Plaintiff(s),          }
         v.                                 }
                                            }
LEIGH S. BELDEN, STEVEN C. TAYLOR,          }
TIMOTHY R. ANDERSON, C.W. SMITH,            }
POWELL GOLDSTEIN LLP, and                   }
RAYMOND JAMES & ASSOCIATES, INC.            }
                                            }
                     Defendant(s).          }

## MEMORANDUM OPINION

Now before the Court for consideration is defendant Powell Goldstein LLP's Motion to Dismiss plaintiff's Second Amended Complaint. After reviewing the record and all briefs submitted in connection with the motion, and after consideration of the parties' arguments at a hearing held in this matter on October 29, 2009, the Court enters the following decision granting the motion to dismiss plaintiff's pre-petition and post-petition claims.

## PROCEDURAL HISTORY AND BACKGROUND

1.     On April 8, 2008, plaintiff, Darryl S. Laddin, the liquidating trustee for the bankruptcy estates Verilink Corp. ("Verilink") and Larscom, Inc. ("Larscom"), filed a complaint against the former directors and officers of Verilink for various claims related in part to the debtor's

acquisition of Larscom on July 28, 2004. Plaintiff alleges that the defendants caused Verilink to acquire Larscom, a company that the defendants allegedly knew was under increasing financial distress, in contravention of the defendants' fiduciary duties which eventually led to Verilink's insolvency and subsequent bankruptcy.

2.      On September 29, 2008, plaintiff filed an amended complaint adding the law firm of Powell Goldstein LLP ("Powell Goldstein") as a defendant based on the law firm's alleged breach of fiduciary duties, malpractice, civil conspiracy and other claims related to the firms representation of Verilink during the debtor's acquisition of Larscom.[1]  Plaintiff alleges that Powell Goldstein and the other defendants wrongfully caused Verilink to acquire Larscom and seeks damages "in no event less than the approximately $25 million to $30 million dimunition [sic] in Verilink's fair value resulting from the Larscom acquisition, including but not limited to, the negative operating cash flow, assumption of liabilities and out-of-pocket acquisition costs."[2]

3.      On December 17, 2008, Powell Goldstein filed a Motion to Dismiss the Corrected Amended Complaint on the grounds that the pre-petition claims were time-barred under Alabama law.

4.      On February 12, 2009, plaintiff filed a Motion to Amend the complaint to add post-petition malpractice claims against Powell Goldstein related to the law firms representation of Verilink during the bankruptcy proceeding.  With regard to the post-petition claims, plaintiff alleges that Powell Goldstein : (1) suffered from conflicts of interest during the bankruptcy proceeding by not affirmatively advising plaintiff or disclosing that Powell Goldstein had committed malpractice

---

[1]      On October 30, 2008, Laddin filed a Corrected Amended Complaint.

[2]      Plaintiff's Corrected Amended Complaint, ¶ 157.  *See also* Plaintiff's Second Amended Complaint, ¶ 186.

Case 08-80072-JAC    Doc 256    Filed 12/03/09    Entered 12/03/09 13:56:31    Desc Main
Document    Page 2 of 42

in connection with its representation of Verilink in the 2004 Larscom transaction; and (2) by withholding documents from plaintiff that allegedly support a claim against Powell Goldstein for malpractice in connection with the 2004 Larscom transaction.

5.      On April 9, 2009, this Court entered an order granting Powell Goldstein's Motion to Dismiss the Corrected Amended Complaint and denying plaintiff's Motion to Amend.[3]

6.      On August 21, 2009, the District Court for the Northern District of Alabama entered a decision overruling the order to the extent same denied plaintiff's Motion to Amend.[4]  The district court further ruled that "as a matter of law, the claims in Appellant's [plaintiff's] proposed Second Amended Complaint, to the extent they are post-petition claims against Powell Goldstein that arise from conduct during the bankruptcy proceedings, are not time barred by the ALSLA [the Alabama Legal Service Liability Act]."[5]  The district court further recognized that plaintiff's pre-petition claims would be time-barred "[i]f the ALSLA is applicable to Powell Goldstein."[6] The district court then remanded the case for consideration of whether the ALSLA applies to Powell Goldstein and, if not, what the effect will be on limitation issues in this case.  In making this determination, the district court posed the following questions for this Court to consider:

> Is a professional corporation, partnership or association considered to be licensed to practice law and a 'legal service provider' in Alabama if one or more of its members is licensed to practice law in Alabama?  Under what circumstances can an out of state law firm be considered a 'legal service provider' subject to the ALSLA?[7]

---

[3]      *See In re Verilink Corp.*, 408 B.R. 420 (Bankr. N.D. Ala. 2009).

[4]      *See In re Verilink Corp.*, 410 B.R. 697 (N.D. Ala. 2009).

[5]      *Id.* at 703.

[6]      *Id.*

[7]      *Id.* at 705.

Case 08-80072-JAC    Doc 256    Filed 12/03/09    Entered 12/03/09 13:56:31    Desc Main
Document    Page 3 of 42

The district court further stated that it was not, in any way, suggesting "the merits of any claims in the proposed amendment."[8]

7.      On August 27, 2009, by agreement of the parties, this Court entered an order deeming plaintiff's Second Amended Complaint filed as of August 21, 2009 and requiring Powell Goldstein to answer, move to dismiss, or otherwise respond on or before September 21, 2009.

8.      On September 21, 2009, Powell Goldstein filed a Motion to Dismiss Plaintiff's Second Amended Complaint which is now before the Court for consideration.

## STANDARD ON MOTION TO DISMISS

In deciding a motion to dismiss, all the facts alleged in the complaint must be accepted as true and construed in the light most favorable to the plaintiff.[9]  "A motion to dismiss should not be granted unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"[10]  However, "[a] court 'may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action.'"[11]  Dismissal "on statute of

---

[8]      *Id.*

[9]      *In re Gunn*, 317 Fed.Appx. 883, 885 (11th Cir. 2008).  *See In re Fernandez-Rocha*, 451 F.3d 813, 815 n. 3 (11th Cir. 2006).

[10]      *Official Comm. of Unsecured Creditors of PSA*, 437 F.3d 1145 (11th Cir. 2006)(quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101, 2 L. Ed. 2d 80 (1957)).

[11]      *Daewoo Motor Am., Inc. v. General Motors Corp.*, 459 F.3d 1249, 1271 (11th Cir. 2006)(quoting *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

4

limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred."[12]

## FINDINGS OF FACT

As the Court must accept all of the facts alleged in the complaint as true, the Court will set out verbatim limited portions of the facts and allegations contained in plaintiff's Second Amended Complaint as relevant to Powell Goldstein.

## PRE-PETITION CLAIMS

1.     Bryan Cave Powell Goldstein LLP is a law firm formed through the January 1, 2009, merger of Bryan Cave LLP and Powell Goldstein LLP. The firm is now known throughout the United States as Bryan Cave LLP, but for the next two years is doing business as Bryan Cave Powell Goldstein LLP in the Atlanta, Georgia, market. Upon information and belief Bryan Cave LLP (dba Bryan Cave Powell Goldstein LLP in Atlanta) is the successor in interest to Powell Goldstein LLP. For ease of reference, this defendant is referred to collectively as "PoGo" throughout this Complaint. During all relevant times, PoGo was a law firm and limited liability partnership organized and existing under the laws of the State of Georgia. PoGo served as general outside legal and corporate counsel to Verilink at all times relevant to this action. PoGo advised the Verilink Defendants, and purportedly Verilink, in connection with Verilink's acquisition activities including, but not limited to, the structure and negotiation of acquisition agreements, the preparation of related public filings with the Securities and Exchange Commission ("SEC"), public statements concerning Verilink's financial condition, earnings and guidance issued by the Insider Defendants, and the adequacy of disclosure of material information relating to Verilink's acquisitions, among other things. PoGo also acted as bankruptcy counsel to the Verilink and Larscom Debtors in these bankruptcy proceedings.[13]

2.     Considering Larscom's long history of a deteriorating financial condition and that it was now on the brink of no longer continuing as a going concern, and

---

[12]     *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005)(citing *Knight v. E.F. Hutton & Co.,* 750 F. Supp. 1109, 1112 (M.D. Fla. 1990).

[13]     Plaintiff's Second Amended Complaint, ¶ 14.

5

Verilink's own lack of adequate working capital and/or long term capital plan, on April 23, 2004, Raymond James, the Verilink Defendants and PoGo all failed to advise Verilink that it should not proceed with the Larscom acquisition *at any price.* Instead, Raymond James, PoGo and the Verilink Defendants continued to advise Verilink regarding the structure and terms of the merger agreement, pushing the entire transaction toward an eventual closing. Nevertheless, Raymond James, PoGo and the Verilink Defendants all failed to insure that Verilink was adequately protected.[14]

3.    At this time, PoGo failed to advise Verilink of the limited relief available to Verilink under the Raymond James engagement letter in the foreseeable event that Raymond James did not have a good faith or reasonable basis for its valuation of Larscom and fairness opinion, knowing that Verilink's shareholders and regulators would rely upon that valuation and fairness opinion with regard to their approval of the acquisition. As set forth above, PoGo again failed to adequately advise Verilink at this time of the lack of protection to Verilink in the definitive merger agreement that it drafted and helped negotiate. In doing so, PoGo put its own interests of continuing to be retained by Verilink's management, by either assisting or turning a blind eye to the Verilink Defendants' and Raymond James' misconduct, ahead of the interest of its client, Verilink.[15]

4.    By April 26, 2004, PoGo knew that the Verilink Defendants had grossly misrepresented to RBC that the Larscom acquisition would be cash flow positive to Verilink in 2004. Nothing could be farther from the truth and Defendants knew it. Nevertheless, PoGo failed to take adequate steps to ensure that Verilink's board had been advised of the Verilink Defendants' misrepresentation to RBC so that the misrepresentation could be corrected in order to protect harm to Verilink's highly critical revolving line of credit. Once again, PoGo put its own interests of continuing to be retained by Verilink's management, by either assisting or turning a blind eye to the Verilink Defendants' misconduct, ahead of the interest of its client, Verilink.[16]

5.    In its capacity as Verilink's outside counsel on the acquisition, PoGo advised the board of its fiduciary duties to Verilink in an acquisition context and discussed the basis for the board relying on external information such as a fairness opinion in reaching its decision regarding the acquisition. PoGo did not advise Verilink's board that, under the circumstances:

- the fairness opinion was without basis;

---

[14]    Plaintiff's Second Amended Complaint, ¶ 111.

[15]    Plaintiff's Second Amended Complaint, ¶ 119.

[16]    Plaintiff's Second Amended Complaint, ¶ 123.

• reliance on the fairness opinion was not appropriate in fulfilling board members' fiduciary duties to the Company;

• Raymond James' engagement agreement did not adequately protect Verilink;

• the proposed merger agreement did not provide adequate protection to Verilink; and

• it would be inappropriate to seek shareholder approval for the acquisition by inclusion of the materially misleading fairness opinion.

Had PoGo exercised its professional responsibilities and fiduciary duties to the Company by informing the full board of these matters, the board never would have approved the acquisition of Larscom under the terms and conditions set forth in the proposed merger agreement and based upon Raymond James' materially misleading valuation and fairness opinion. Yet again PoGo put its own interests of continuing to be retained by Verilink's management, by either assisting or turning a blind eye to the Verilink Defendants' and Raymond James' misconduct, ahead of Verilink's interests.[17]

6.     Moreover, both Raymond James and PoGo should have advised Verilink not to  accept a merger agreement that did not require independent verification of Larscom's working capital and revenue levels at closing, especially considering:

• Larscom's known lack of veracity;

• Larscom's auditor's going concern opinion;

• Larscom's working capital was highly critical to Verilink due to its own lack of working capital and/or long term capital plan, and Verilink's reliance on cash flow from operations for its long term working capital needs;

• Raymond James $29 million valuation and fairness opinion were based, in substantial part, on Larscom achieving $24 million in revenue in 2004; and

---

[17]     Plaintiff's Second Amended Complaint, ¶ 133.

7

- If Larscom's working capital or revenue levels were materially understated relative to the minimum allowed thresholds, Verilink had no recourse primarily because Larscom's officers and directors were to be indemnified by Verilink in the merger agreement.[18]

7.      On June 14, 2004, Verilink filed with the SEC on Form S-4 its proxy statement seeking shareholder approval of the Larscom acquisition and the issuance of additional shares of Verilink stock as consideration for the purchase price to complete the acquisition. Ten days later, on June 24, 2004, Verilink filed an amended proxy statement with the SEC on Form S-4/A (Verilink's initial and amended proxy statements are hereinafter referred to as the "Proxy Statement").[19]

8.      By no later than the period between July 7 and July 16, 2004, Defendants knew that both Verilink's and Larscom's financial results were materially worse than shareholders of either company had been conditioned to expect. For example, Defendant Smith and PoGo discussed that Verilink's financial results for its fourth fiscal quarter of 2004 were materially below Verilink's April 28, 2004, guidance that Verilink expected profitability, excluding merger related costs, and would have positive cash flow from operations. PoGo advised Smith that Verilink was required to publicly disclose this material fact prior to shareholder approval of the acquisition and indicated that failure to disclose would be a "[g]ood count for [a] lawsuit." Knowing that: (a) the Verilink Defendants had sought to hide Larscom's revenue in a side letter to the merger agreement; (b) the Verilink Defendants had sought to hide Larscom's financial results for the third and fourth quarter of 2004; (c) the structure of the merger agreement did not protect Verilink; (d) Smith had grossly misrepresented to RBC that the acquisition would be cash accretive to Verilink; (e) Verilink's financial condition as of the end of fiscal year 2004, particularly its working capital level and its need to maintain its revolving line of credit with RBC; (f) Larscom's financial results reflected increasing negative cash flow from operations; and (g) Verilink was required to update Larscom's financial information if "there were significant subsequent events that would materially affect an investor's understanding of the target company," PoGo failed to ensure that Verilink's board was properly advised of the requirement for full disclosure on all material matters, including Verilink's missed guidance and Verilink's and Larscom's financial condition, by delegating that task to Smith and failing to confirm with the full board that it had been done.[20]

---

[18]      Plaintiff's Second Amended Complaint, ¶ 134.

[19]      Plaintiff's Second Amended Complaint, ¶ 137.

[20]      Plaintiff's Second Amended Complaint, ¶ 138.

9.     Among other things, and in light of the facts known to Defendants at the time Verilink filed the Proxy Statement, or was under a duty to correct it, the Proxy Statement directly, or indirectly through incorporation of other disclosures, affirmatively misrepresented to shareholders that:

• Defendants had fulfilled their fiduciary duties to Verilink in evaluating the Larscom transaction, properly advising the Company with respect thereto and recommending it to Verilink's shareholders -- "After careful consideration, Verilink's board of directors unanimously determined that the merger is fair to and in the best interests of Verilink and its stockholders and adopted the merger agreement." (Repeated throughout the Proxy);

• Raymond James' valuation of Larscom and its opinion that the price Verilink paid to acquire Larscom was financially fair to Verilink – "[I]t is our opinion that, as of April 28, 2004, the consideration to be paid by the Company in connection with the Merger is fair, from a financial point of view, to the Company." (Proxy at B-2);

• Verilink's guidance for its fourth quarter of fiscal year 2004 of expected profitability, excluding merger related costs, and positive cash flow from operations was true and, as such, Verilink had the available cash flow from operations to adequately capitalize Larscom's operations and to achieve the purported synergies to be derived from the Larscom acquisition (Incorporated into the Proxy by general reference to SEC filings); and

• Defendants had fulfilled their fiduciary duties to Verilink in insuring that Larscom had maintained its threshold working capital levels prior to the acquisition and properly advising the Company with respect thereto -"Verilink has accepted Larscom's determination that Larscom's closing net adjusted working capital shall exceed the targeted amount. . . ." (Filed with the SEC on July 21, 2004, on Form 425, and incorporated into the Proxy).[21]

10.     The foregoing affirmative misstatements and omissions in the Proxy Statement - a document which PoGo drafted, revised and advised Verilink about -- were highly material and, had they been properly disclosed, clearly would have altered the total mix of information available to Verilink's shareholders. Indeed, had this information been disclosed to Verilink's shareholders prior to their vote, no

---

[21]     Plaintiff's Second Amended Complaint, ¶ 139.

9

reasonable shareholder would have voted in favor of the acquisition. Lacking the true information about Verilink's and Larscom's financial condition and future prospects, including the level of Larscom's 2004 revenue as anticipated by Defendants, Larscom's inadequate level of working capital, Larscom's continued loss from operations, Larscom's and Verilink's customer and product problems, Verilink's shareholders were unable to make a reasonably informed decision concerning the Larscom acquisition and the issuance of additional Verilink shares as consideration to be paid.[22]

11.     In its capacity as Verilink's general outside legal counsel, and counsel for the Larscom acquisition, and considering its knowledge of: (a) Verilink's financial condition and lack of a long term capital plan; (b) Larscom's financial condition; (c) the lack of a reasonable basis for Raymond James' valuation of Larscom and the fairness opinion; (d) the Insider Defendants' material misrepresentations and omissions to shareholders, securities regulators and Verilink's lenders; and (e) reliance upon such material misrepresentations and omissions by Verilink's shareholders and the securities regulators in approving the acquisition, PoGo had no reasonable basis to advise Verilink to issue the proxy (that PoGo in fact drafted) in support of the Larscom acquisition.[23]

12.     On July 28, 2004, Verilink completed its acquisition of Larscom and issued approximately 5,946,897 shares of common stock for all the outstanding stock of Larscom. Verilink also assumed all outstanding stock options and warrants of Larscom and all of Larscom's debt and operating obligations.[24]

13.     After the close of the Larscom acquisition, PricewaterhouseCoopers had begun the process of auditing Verilink's financial statements for fiscal year 2004. A critical aspect of PricewaterhouseCoopers' audit process was to determine Verilink's ability to continue as a going concern.[25]

14.     Utilizing a discounted cash flow analysis on the combined Verilink entity's cash flow from operations, and with PricewaterhouseCoopers' concurrence, Verilink's audit committee (composed entirely of Verilink's outside directors) determined that a massive $20 million permanent impairment of Verilink's goodwill was required. Approximately 75% of the $20 million impairment related to all of the

---

[22]     Plaintiff's Second Amended Complaint, ¶ 141.

[23]     Plaintiff's Second Amended Complaint, ¶ 143.

[24]     Plaintiff's Second Amended Complaint, ¶ 146.

[25]     Plaintiff's Second Amended Complaint, ¶ 147.

$15.6 million in goodwill Verilink recognized from the Larscom transaction. Thus, within just two months following the Larscom acquisition, Verilink astoundingly impaired all of the goodwill it had recognized from the Larscom transaction, which constituted roughly 56% of the entire $27.9 million consideration Verilink paid for Larscom! This write down in the Larscom goodwill reflected that Larscom's cash flow in the short term was negative and that, at best, in the long term was *de* Thus, Larscom was a financial dead weight that began to send Verilink into insolvency.[26]

15.     Had Verilink either not acquired Larscom or not acquired Larscom in the manner that it did, i.e., without adequate capital and/or a long term capital plan, Verilink would not have become insolvent. Consequently, Verilink's acquisition of Larscom was the primary and a proximate cause of the write down in goodwill Verilink's going concern opinion and, ultimately, Verilink's financial collapse and subsequent bankruptcy as well.[27]

16.     Verilink was damaged by the Defendants' conduct in an amount to be proven at trial but in no event less than the approximately $25 to $30 million dimunition [sic] in Verilink's fairvalue resulting from the Larscom acquisition including, but not limited to, the negative operating cash flow, assumption of liabilities and out-of-pocket acquisition costs.[28]

17. The Verilink Defendants issued the Proxy statement to solicit Verilink shareholder approval of the Larscom transaction.[29]

18.     The Proxy statement contained material misrepresentations and omissions of material fact as alleged in detail above.[30]

19.     The material misrepresentations and omissions in the Proxy induced Verilink's shareholders to approve the Larscom acquisition that ultimately damaged Verilink.[31]

---

[26]     Plaintiff's Second Amended Complaint, ¶ 151.

[27]     Plaintiff's Second Amended Complaint, ¶ 156.

[28]     Plaintiff's Second Amended Complaint, ¶ 157.

[29]     Plaintiff's Second Amended Complaint, ¶ 216.

[30]     Plaintiff's Second Amended Complaint, ¶ 217.

[31]     Plaintiff's Second Amended Complaint, ¶ 220.

11

## POST-PETITION CLAIMS

1.      Over the course of the ten-month period after Verilink filed its Chapter 11 petition and through the Effective Date of the Plan, Plaintiff and Hayden Kepner ("Kepner") (who then both were counsel to the Creditors' Committee) repeatedly discussed and/or met with Wendy Hagenau ("Hagenau") of PoGo, among other PoGo attorneys, regarding the Creditors Committee's discovery of Verilink to evaluate possible third party claims available to the Estate and thus obtain an understanding of Verilink's assets available for distribution to creditors. However, throughout that period PoGo repeatedly delayed and avoided turnover of Verilink's board materials and minutes, along with PoGo's own files, among other things that would put Plaintiff on notice of the claims related to the Larscom transaction.[32]

2.      Even worse, given its explicit knowledge of the facts underlying the claims related to the Larscom transaction, PoGo actively concealed from the Creditors Committee, the Estate and this Court the potential claims, the relevant facts and PoGo's unwaivable conflict in the matter, all while PoGo was acting as Verilink's bankruptcy counsel.[33]

3.      Between early August and late September 2006, Plaintiff spoke to or met with Hagenau or other PoGo attorneys on at least five separate occasions (August 17, August 23, August 31, September 6, and September 28) regarding the turnover or production of Verilink's various corporate records, including its corporate minutes, that were in PoGo's possession.[34]

4.      Not only did PoGo stonewall the Creditors Committee with respect to production of Verilink's documents, it also actively concealed its own complicity in the Larscom transaction from Plaintiff and the Creditors Committee during the negotiation and discussions relating to the Plan.[35]

5.      On September 21, 2006, prior to the filing the First Joint Plan of Reorganization, Plaintiff and Kepner met at PoGo's office with Hagenau and Carol Denniston, counsel to Verilink's outside directors. The meeting had several purposes:

> (1) to brainstorm and discuss potential legal claims against Verilink's officers and directors, and various third party professional advisors to Verilink, in an effort to return assets to the Liquidating Trust once established;

---

[32]     Plaintiff's Second Amended Complaint, ¶ 244.

[33]     Plaintiff's Second Amended Complaint, ¶ 245.

[34]     Plaintiff's Second Amended Complaint, ¶ 246.

[35]     Plaintiff's Second Amended Complaint, ¶ 247.

12

(2) to address the possibility of settlement of such claims;

(3) to address the Creditors Committee's continuing outstanding discovery demands of Verilink related to such claims; and

(4) to enable PoGo, Verilink and the Creditor's Committee to reach agreement on the provisions of the joint plan of reorganization, particularly including the reservation of claims provision.[36]

6.      At the time of that meeting, PoGo had full knowledge of the facts giving rise to claims against PoGo and the other Defendants relating to the Larscom transaction as reflected in, among other things, the following materials finally obtained from PoGo in late July/early August 2008:

● an e-mail originating from Defendant Raymond James and copied to Pogo, and Verilink's board meeting minutes from a March 29, 2004, board meeting, all indicating that Raymond James had advised PoGo and Verilink and PoGo prior to execution of the letter of intent with Larscom that Larscom was "likely to burn cash through closing" and therefore an appropriate offer strategy for Larscom should include material adverse condition ("MAC") termination language providing for downside protection on Larscom's minimum working capital at closing of $6.1 million and a minimum Larscom revenue threshold at closing of $5 million;

● an undisclosed side-letter to the definitive merger agreement sent from Larscom to Verilink that established an inadequate minimum revenue threshold for Larscom to meet which, in light of facts known to PoGo and the other Defendants about Larscom's and Verilink's financial conditions at the time, afforded no adequate termination protection for Verilink;

● contemporaneous notes of one of the PoGo attorneys who led PoGo's ongoing corporate representation of Verilink, including in the Larscom transaction, reflecting that PoGo knew Defendants intended to keep "hidden" from Verilink's shareholders Larscom's second and third quarter 2004 deteriorating revenue levels; and

---

[36]      Plaintiff's Second Amended Complaint, ¶ 248.

13

- contemporaneous notes of the same PoGo attorney indicating that Defendants' failure to update Verilink's April 28, 2004 guidance (that Verilink would have positive earnings and positive cash flow going forward) would be a "[g]ood count for [a] lawsuit" in light of known adverse financial information that had not been disclosed in advance of the then-pending Larscom transaction.[37]

7.       Despite PoGo's direct knowledge of these facts giving rise to the legal claims at issue relating to the Larscom transaction, at no time during the September 21 meeting did Hagenau either mention the possibility of claims against PoGo, disclose verbally or in writing that PoGo might have a conflict of interest, or mention possible claims against the other Defendants relating to the Larscom transaction. Rather, at the September 21 meeting Hagenau and PoGo made an affirmative effort to focus Plaintiff and the Creditors Committee on potential claims against Verilink's directors and officers ("D&O") related to a series of adverse financing arrangements Verilink entered into after entering the zone of insolvency by the end of 2004 (the `PIPE Notes"), and, thus, away from claims relating to the Larscom transaction itself that led Verilink into the zone of insolvency.[38]

8.       Thus, between October 26, 2006, and November 2, 2006, Plaintiff had no less than four telephone conversations with Hagenau to discuss potential litigation, including litigation against the D&Os focused on the PIPE Note issues, as well as the related revisions to both the draft joint reorganization plan and the draft disclosure statement. Again, despite several opportunities to do so, at no time did Hagenau disclose PoGo's conflicts of interest, the possibility of legal claims against PoGo or the other Defendants relating to the Larscom transaction but instead engaged Plaintiff and Kepner in discussions pertaining to potential D&O liability arising from the PIPE Notes.[39]

9.       On or about November 11, 2006, Plaintiff, on behalf of the Creditors' Committee served document requests on Verilink through PoGo demanding, among other things, Verilink's board materials relating to the Pipe Note transactions. PoGo's time records reveal that on November 11, Hagenau reviewed the Creditors' Committee's document requests, discussed them with Eliott Robinson (the lead PoGo attorney representing Verilink in the Larscom transaction as well as its long-time outside legal counsel), and "review[ed] minutes . . . and look[ed] for documents requested." Additional time entries by Hagenau on November 10, 13, and 14, 2006,

---

[37]       Plaintiff's Second Amended Complaint, ¶ 249.

[38]       Plaintiff's Second Amended Complaint, ¶ 250.

[39]       Plaintiff's Second Amended Complaint, ¶ 251.

14

reflect discussions between Hagenau and Robinson and between Hagenau and Defendant Smith regarding the requested documents. On November 13, 2006, Kepner spoke to Hagenau concerning the status of the Creditors' Committees' outstanding discovery requests. At this point, PoGo and Verilink still had not produced all of the pertinent records, including Verilink's critical board materials and minutes during the relevant time period.[40]

10.      Thereafter, Verilink and the Creditors Committee completed the negotiation and drafting of the joint reorganization plan. And, on December 7, 2006 Verilink filed its Second Amended Joint Plan of Reorganization (the "Plan") (Docket No. 708) . . . .[41]

11.      On January 11, 12, and 22, 2007, Kepner and Hagenau again discussed the status of potential litigation with the D&Os for substantial periods of time. Among other things, the status of the Creditors Committee's outstanding document requests were again discussed.[42]

12.      On February 1, 2007, after confirmation of the Plan, but prior to its effective date, Hagenau met with Plaintiff, then identified as Liquidating Trustee, regarding turnover of Verilink's assets to the Liquidating Trust. Plaintiff requested that PoGo's legal files and all other Verilink corporate documents, including its board materials and meeting minutes, be turned over to the Liquidating Trust. Despite, Plaintiff's request for these documents, and PoGo's obligation to turn them over, PoGo did not do so at that time.[43]

13.      Over the course of the next year, Plaintiff and Kepner made informal requests to PoGo that the documents be turned over, but they never were. Indeed, on April 2, 2008, Kepner wrote to Hagenau and again asked for all of PoGo's pre-bankruptcy files on Verilink, emphasizing those relating to the PIPE Notes, and asking whether PoGo needed to be provided with a "formal request" for the files. *Hagenall did not respond to this e-mail until April 14, 2008 — nearly a week after the explicit two-year provision set forth in 11 U.S.C.A. §108(a)(2) for the Trustee to bring actions had expired* — stating only "I am not ignoring you, but swamped at the moment. I will call you to discuss."[44]

---

[40]      Plaintiff's Second Amended Complaint, ¶ 252.

[41]      Plaintiff's Second Amended Complaint, ¶ 253.

[42]      Plaintiff's Second Amended Complaint, ¶ 254.

[43]      Plaintiff's Second Amended Complaint, ¶ 256.

[44]      Plaintiff's Second Amended Complaint, ¶ 257.

15

14.     In the interim, the initial complaint in this action was filed on April 8, 2008. It focused heavily on Defendants' actions relating to the PIPE Notes. At the time, Plaintiff did not have any of the pertinent Verilink and PoGo documents, including Verilink's board materials and minutes and PoGo's e-mail communications and attorney notes, that would have alerted Plaintiff to the possibility of the claims against PoGo and the other Defendants related to the Larscom transaction, among other matters alleged in the Complaint. As further explained below, Plaintiff did not receive these materials until late July/early August 2008 after repeated requests for PoGo to turnover the materials. Moreover, no publicly available materials would have put Plaintiff on inquiry notice of such claims.[45]

15.     When counsel for Plaintiff was finally able to speak to Hagenau on April 29, 2008, she took the position that, unless Plaintiff could "point out . . . where the Plan indicate[d] he ha[d] the authority to waive the [attorney client] privilege," she would not turn over the documents and would seek a protective order." The following day, April 30, 2008, Hagenau wrote to Plaintiff, Kepner and Plaintiff's counsel asserting: "I do not need a formal discovery request but do need a written request for what you want. Please state in the letter [Plaintiff's] . . . position that he has the [attorney client] privilege and is consenting to the transfer of the files. I would also appreciate a cite to the provision in the plan permitting [Plaintiff] . . . to waive the privilege and/or case authority." Such a position was absurd in light of the facts that all of Verilink's remaining assets were transferred to the Liquidating Trust pursuant to the Plan, that Hagenau herself drafted the Plan, and that such assets necessarily included, as a matter of law, Verilink's corporate records and PoGo's legal files.[46]

16.     Nevertheless, over the course of the next two weeks, Kepner endeavored to obtain written acknowledgement from the reorganized Verilink debtors regarding the privilege issue.[47]

17.     On May 15, 2008, Kepner sent Hagenau a letter on behalf of Plaintiff stating that Kepner had "previously requested that Powell Goldstein forward . . . all files, records, correspondence, documents, and any other materials, including electronic data and emails that Powell Goldstein may have in its possession or control that in any way relates to the Debtors or Powell Goldstein's representation of the Debtors." The letter further represented that Plaintiff owned Verilink's attorney client privilege and that the reorganized Verilink debtors waived any privilege they might have," attaching a communication from the reorganized debtors confirming the same.

---

[45]     Plaintiff's Second Amended Complaint, ¶ 258.

[46]     Plaintiff's Second Amended Complaint, ¶ 259.

[47]     Plaintiff's Second Amended Complaint, ¶ 256.

Finally, the letter clearly instructed PoGo to forward "all Verilink records to the Trustee."[48]

18.     Following Plaintiff's May 15 letter, PoGo still did not immediately turn over requested documents, let alone turn over all its files to the Liquidating Trust as assets of the estate. Instead, PoGo disrupted and delayed its production by producing some requested documents in a piecemeal, fragmented sequence, while omitting other documents that revealed PoGo's wrongdoing. This required additional time to review the partial files, determine what was missing, make a new set of requests for the omitted documents, then wait for a response and supplemental production. Ultimately, after having received requests for pertinent documents for two years, PoGo did not produce the key documents necessary to determine PoGo's liability in the matter until mid July through early August of 2008.[49]

19.     On July 17, 2008 PoGo produced three binders containing Verilink's board minutes. Astonishingly, the board minutes for the 2002 through 2004 time-period pertinent to the Larscom transaction and the individual defendants' insider stock trading activity *were not produced!* When called to task on this omission, PoGo finally produced two binders containing Verilink's board minutes for the 2002 through 2004 time-period the following day, however the board packages and other materials were not included.[50]

20.     It wasn't until July 21, 2008, that PoGo finally produced copies of documents identified for copying on June 26 during a document review session in PoGo's offices. That production contained a few of the key documents in the form of attorney notes indicating PoGo's knowledge of the facts and actual complicity in the misconduct alleged in the Complaint. On July 31, 2008, PoGo finally produced pertinent attorney email relating to the XEL and Larscom acquisitions. It was only upon a review of this email, coupled with a review of the PoGo attorneys' notes and the pertinent board materials, when Plaintiff was able to allege many of the causes of action not previously alleged in the initial complaint.[51]

21.     Within approximately two months of the production of these documents, Plaintiff filed the Amended Complaint on September 29, 2008, after a brief extension of the scheduling order to add new parties, including PoGo, and to provide PoGo an opportunity to refute the basis for the claims asserted against it. Had the documents,

---

[48]     Plaintiff's Second Amended Complaint, ¶ 261.

[49]     Plaintiff's Second Amended Complaint, ¶ 262.

[50]     Plaintiff's Second Amended Complaint, ¶ 263.

[51]     Plaintiff's Second Amended Complaint, ¶ 264.

17

other materials and knowledge in PoGo's possession not been fraudulently concealed from Plaintiff prior to the filing of the initial complaint, Plaintiff would have been able to assert such claims against PoGo and the other defendants at that time.[52]

Based upon the above quoted allegations set forth in plaintiff's Second Amended Complaint as well as the allegations contained in the Corrected Amended Complaint, plaintiff asserts claims against Powell Goldstein for breach of fiduciary duty (Count XIII), malpractice (Count XIV), civil conspiracy (Count XV), and aiding and abetting breach of fiduciary duty (Count XVI) based on Powell Goldstein's representation of Verilink in the July 28, 2004 acquisition of Larscom. Collectively, the claims asserted in Counts XIII-XVI are referred to as the "pre-petition claims." The claims asserted in the Second Amended Complaint for conflicts of interest (Count XXI), professional malpractice (Count XXII), and fraudulent concealment and professional malpractice (Count XXIII) are based on Powell Goldstein's representation of Verilink in the bankruptcy proceedings and are collectively referred to as the "post-petition claims."

## CONCLUSIONS OF LAW

I.    **The ALSLA Applies to Powell Goldstein as a Law Firm Composed of Members who are Licensed to Practice Law in the State of Alabama. Pursuant to Alabama's Four-Year Statue of Repose under ALA. CODE § 6-5-574, Plaintiff's Pre-Petition Claims Against Powell Goldstein are Time-Barred.**

Powell Goldstein contends that plaintiff's various pre-petition claims are barred by the ALSLA's four year statute of repose because Powell Goldstein is a law firm composed of attorneys who are licensed to practice law in Alabama and plaintiff's pre-petition claims arise out of Verilink's receipt of corporate legal services Powell Goldstein performed in Alabama. Plaintiff counters that

---

[52]    Plaintiff's Second Amended Complaint, ¶ 265.

18

the ALSLA does not apply to the law firm's pre-petition conduct because the Powell Goldstein lawyers who actually provided the pre-petition legal services were not licensed to practice law in the State of Alabama.

After a thorough examination of the relevant sections of the act, codified at ALA. CODE §§ 6-5-570 to 581, and the applicable case law interpreting same, the Court firmly believes that the ALSLA applies to Powell Goldstein's conduct under the circumstances of this case where there was an attorney client relationship between Powell Goldstein and Verilink, the injury to the plaintiff occurred in Alabama where Verilink was headquartered at the relevant time; Powell Goldstein is composed of members who are licensed to practice law in Alabama; and Powell Goldstein served as general and corporate counsel to Verilink at all times relevant to the pre-petition claims.

The ALSLA provides that "[t]here shall be only one form and cause of action against legal service providers in courts in the State of Alabama and it shall be known as the legal service liability action and shall have the meaning as defined herein."[53]  The term legal service provider is defined by the ALSLA as:

> (2) LEGAL SERVICE PROVIDER.  Anyone licensed to practice law by the State of Alabama or engaged in the practice of law in the State of Alabama.  The term legal service provider includes professional corporations, associations, and partnerships and the members of such professional corporations, associations, and partnerships and the persons, firms, or corporations either employed by or performing work or services for the benefit of such corporations, associations, and partnerships including, without limitation, law clerks, legal assistants, legal secretaries, investigators, paralegals, and couriers.[54]

The question specifically before this Court as posed by the district court is "[u]nder what circumstances can an out of state law firm be considered a 'legal service provider' subject to the

---

[53]     ALA. CODE § 6-5-573 (1975).

[54]     ALA. CODE § 6-5-572(2)  (1975).

19

ALSLA?"[55] While this question has not been specifically addressed by any of the Alabama cases interpreting Alabama's definition of "legal service provider," this Court finds that the cases cited by both of the parties supports this Court finding that the ALSLA applies to Powell Goldstein under the circumstances of this case.[56]

In *Alabama Educ. Ass'n v. Nelson*, 770 So. 2d 1057, 1058 (Ala. 2000), the Alabama Supreme Court recognized that the first sentence in § 6-5-572(2) which reads "Anyone licensed to practice law by the State of Alabama **or** engaged in the practice of law in the State of Alabama," is written in the disjunctive using the word "or."[57] The Alabama Supreme court stated that "[u]nder § 6-5-572(2), a 'legal service provider' can be either: (1) a person licensed to practice law in the State of Alabama, **or** (2) a person engaged in the practice of law in the State of Alabama."[58] As will be discussed more below, professional corporations, associations and partnership cannot be licensed to practice law in the State of Alabama, yet the *Nelson* court specifically found that the ALSLA applies to law firms so the only way to sensibly read the statute in light of *Nelson* is to find that law firms must fall under the second category as a person or entity engaged in the practice of law in the State of Alabama. Indeed, the *Nelson* court specifically stated on three separate occasions that the definition of "legal service provider" includes law firms or entities that are composed of members licensed to practice law in the State of Alabama. The court wrote:

---

[55]     *See In re Verilink Corp.*, 410 B.R. 697, 705 (N.D. Ala. 2009).

[56]     *See Martin & Martin v. Jones*, 541 S.2d 1 (Ala. 1989)(finding that a Mississippi law firm in which neither of the attorneys in the law firm were licensed to practice law in Alabama was estopped from asserting breach of contract claim against clients in Alabama).

[57]     ALA. CODE § 6-5-572(2) (emphasis added).

[58]     *Alabama Educ. Ass'n v. Nelson*, 770 So. 2d 1057, 1058 (Ala. 2000)(emphasis added).

20

In order to ascertain the meaning of a statute, we look first to the plain meaning of the words written by the Legislature. *Johnson v. Price*, 743 So. 2d 436, 438 (Ala. 1999). The plain meaning of the words used in § 6-5-572(2) indicates that the Legislature contemplated that the term "legal service provider" would include a professional corporation, association, or partnership itself; the members of a professional corporation, association, or partnership who are licensed to practice law within the State of Alabama; and others not licensed to practice law but who work in furtherance of the practice of law by a professional corporation, association, or partnership-such as "law clerks, legal assistants, legal secretaries, investigators, paralegals, and couriers."

. . . .

We note that throughout the ALSLA, the language used by the Legislature indicates that the Act was intended to apply to **lawyers and law firms**. For example, § 5-572(3)(a) sets out the "standard of care" a "legal service provider" is to observe:

> "The standard of care applicable to a legal service provider is that level of such reasonable care, skill, and diligence as other similarly situated legal service providers in the same general line of practice in the same general locality ordinarily have and exercise in a like case."

. . . .

Clearly this section contemplates that the **ALSLA is to be applied only to lawyers and to law firms** – including professional corporations, associations, and partnerships– whose membership is composed solely of lawyers acting for the purpose of providing legal services.

The plain language of § 6-5-572(2), as well as that of the other portions of the ALSLA, clearly indicates that the Legislature intended for the ALSLA to apply only to **lawyers and to entities that are composed of members who are licensed to practice law within the State of Alabama.**[59]

In a subsequent decision, *Fogarty v. Parker, Poe, Adams & Bernstein, LLP*, 961 So. 2d 784, 789 (Ala. 2006), the Alabama Supreme Court cited *Nelson* for the proposition that the "Legislature intended for the ALSLA to apply only to lawyers and to entities that are composed of members who

---

[59]        *Id.* at 1058-59 (emphasis added).

21

are licensed to practice law within the State of Alabama." While the district court questioned whether *Nelson* and *Fogerty* "may suggest that an entity such as Powell Goldstein must itself be licensed to practice in Alabama" for the ALSLA to apply to same, there is no mechanism or procedure by which a law firm can be licensed to practice law in Alabama.[60] Alabama's occupational licensing statute for attorneys provides that "(e)ach attorney engaged in the practice of law shall pay an annual license tax to the state, but none to the county. . . . If business is conducted as a firm or as a corporation in which more than one lawyer is engaged, each lawyer shall pay such license tax . . . ."[61] Thus, while each member of a law firm engaged in the practice of law in Alabama must be individually licensed, law firms are not separately licensed to practice law in the State of Alabama. Yet, the *Nelson* court clearly recognized that law firms are covered by the ALSLA.

Moreover, when the *Nelson* court explained whom the term "legal service provider" includes, it is important to note that the court listed three separate groups of people or entities: (1) a professional corporation, association, or partnership, i.e. law firms; (2) the members of a professional corporation, association, or partnership who are licensed to practice law within the State of Alabama; and (3) others not licensed to practice law but who work in furtherance of the practice

---

[60] *See* ALA. CODE § 34-3-6(a) providing that "[o]nly persons as are regularly licensed have authority to practice law" in the State of Alabama. *See also* Rule IV(A) of the Rules Governing Admission to the Alabama State Bar providing that "(a)ny person who is at least nineteen (19) years of age, who has complied with the requirements of Rule I, and whose character and fitness have been approved by the Committee on Character and Fitness, is entitled to be examined for admission to the Alabama State Bar . . ." Nothing in the Rules Governing Admission to the Alabama State Bar provides for the admission of law firms to the Alabama State Bar. *See also* ALA. CODE § 40-12-49(a) providing that "(e)ach attorney engaged in the practice of law shall pay an annual license tax to the state, but none to the county. . . . If business is conducted as a firm or as a corporation in which more than one lawyer is engaged, each lawyer shall pay such license tax . . . ."

[61] ALA. CODE § 40-12-49(a).

22

of law by a professional corporation, association, or partnership-such as law clerks, legal assistants, legal secretaries, investigators, paralegals, and couriers. Specifically, the court wrote:

> The plain meaning of the words used in § 6-5-572(2) indicates that the Legislature contemplated that the term "legal service provider" would include a professional corporation, association, or partnership itself; the members of a professional corporation, association, or partnership **who are licensed to practice law within the State of Alabama**; and others not licensed to practice law but who work in furtherance of the practice of law by a professional corporation, association, or partnership-such as "law clerks, legal assistants, legal secretaries, investigators, paralegals, and couriers."[62]

The *Nelson* court separated each legal service provider category by a semicolon and only included the phrase "who are licensed to practice law within the State of Alabama" in the second category governing the individual members of a law firm. The *Nelson* court did not include the licensing requirement in the first category which referred to professional corporations, associations or partnerships i.e. law firms, nor in the last category which covers support personal hired by such entities.

The *Nelson* court can further be cited for the proposition that entities that are not licensed to practice law in Alabama may nevertheless be a "legal service provider" under § 6-5-572(2) if the entity is engaged in the practice of law in the State of Alabama. In *Nelson* a former teacher brought a legal malpractice action against her attorney and the Alabama Education Association ("AEA"). The AEA argued that it was not a "legal service provider" and was, therefore, not subject to liability on a claim of legal malpractice. Because the AEA was "[o]bviously . . . . not licensed to practice law in Alabama," the court stated that it had to consider whether the AEA was nevertheless covered by the ALSLA as a person or entity engaged in the practice of law in Alabama within the meaning

---

[62]     *Nelson*, 770 So. 2d at 1059 (emphasis added).

23

of § 6-5-572(2).[63]  Because the AEA's membership was composed of teachers, the court concluded

that the AEA could not be held liable under the ALSLA.   The court wrote:

> The plain language of § 6-5-572(2), as well as that of the other portions of the
> ALSLA, clearly indicates that the Legislature intended for the ALSLA to apply only
> to lawyers and to entities that are composed of members who are licensed to practice
> law within the State of Alabama.  Because the AEA is not a lawyer or an entity
> whose membership is composed of lawyers, it cannot be held liable under the
> ALSLA.[64]

Under the explanation of the term legal service provider recognized by the Alabama

Supreme Court in *Nelson*, this Court finds that Powell Goldstein qualifies as a legal service provider

as defined by ALA. CODE § 6-5-572(2) because it is a law firm composed of lawyers who are

licensed in Alabama or who are engaged in the practice of law in Alabama.  Powell Goldstein is an

Atlanta, Georgia law firm organized as a limited liability partnership, and its membership includes

attorneys who are licensed to practice law in various states including Alabama.  Powell Goldstein

does not have an office located in Alabama, but four of the firms members are licensed to practice

law in Alabama.[65]

Plaintiff argues that the ALSLA does not apply to Powell Goldstein's conduct with respect

to the Larscom transaction because the lawyers or members of Powell Goldstein who provided the

pre-petition legal services related to the Larscom transaction were not one of the four attorneys in

the firm who are licensed to practice law in the State of Alabama.  It is important to remember,

however, that the plaintiff did not name any individual attorneys as a defendant in the Second

---

[63]     *Id.* at 1058.

[64]     *Id.* at 1059 .

[65]     The four Alabama licensed attorneys are:  James McAlpin, Christopher DiGiorgio, Courtney
Brevelle Thompson, and Robert Mercer.

Amended Complaint.  Instead, the plaintiff elected to sue the entire law firm of Powell Goldstein based on the attorney client relationship that existed between Powell Goldstein and Verilink and based on the corporate legal services Powell Goldstein provided Verilink in this state.

Plaintiff also suggests that the statement in *Nelson* that the ALSLA "is to be applied only to lawyers and to law firms . . . whose membership is composed ***solely*** of lawyers acting for the purpose of providing legal services," should be read to limit the application of the ALSLA to an out-of-state law firm only if the firm is primarily or solely composed of Alabama licensed lawyers.[66] The Court first notes that the real question in *Nelson* was whether or not the AEA was "engaged in the practice of law," within the meaning of § 6-5-572(2).  Clearly, an entity whose membership was composed of teachers was not engaged in the practice of law.  Morever, because the court was addressing a situation in which the AEA's membership was composed of teachers, not lawyers, the statement "composed *solely* of lawyers" can be read to refer more to the distinguishing fact that *Nelson* involved an entity whose membership was not composed of solely lawyers, but was instead composed of teachers.  The Alabama Supreme Court also later reiterated in *Nelson* that the AEA could not be held liable under the ALSLA because the AEA was not a lawyer nor an "entity whose membership is composed of lawyers," dropping in this final instance the term "solely."  This Court further finds in this day and age when law firms have multiple offices throughout the country that it would be an absolute absurdity to require all members of a law firm to be licensed in this state before the ALSLA would apply.[67]  Accordingly, the Court finds that Nelson stands only for the

---

[66]    *Alabama Educ. Ass'n v. Nelson*, 770 So. 2d 1057, 1059 (Ala. 2000)(emphasis added).

[67]    Consider for instance a Birmingham based law firm such as Bradley Arant Boult Cummings LLP which now also has offices located in Nashville, Tennessee.  Under the plaintiff's argument a traditional Alabama based law firm that opens satellite offices out of state in which there may be attorneys who are members of the firm but are not licensed to practice in Alabama, would

proposition that an entity whose membership is composed of non-lawyers cannot be held liable under the ALSLA because non-lawyers are neither licensed to practice law nor can they engage in the authorized practice of law in Alabama.

In *Fogarty v. Parker, Poe, Adams & Bernstein, LLP*, 961 So. 2d 784, 789 (Ala. 2006), the Alabama Supreme Court determined that the ALSLA did not apply to a North Carolina law firm, Parker Poe, where there was no evidence that the named defendant attorneys nor any of the attorneys in the law firm were admitted to practice law in Alabama. In *Fogarty*, the plaintiffs were minority investors in a failed Alabama real estate venture. The Fogartys sued both the North Carolina law firm and the individual attorneys who represented the majority investors in the real estate venture. The Fogartys alleged that the Parker Poe defendants engaged in the unauthorized practice of law in Alabama, made misrepresentations of law, and prevented them from obtaining access to business records of the joint venture. The Parker Poe defendants argued that the Fogartys' exclusive remedy was to allege claims under the ALSLA and because they had not alleged a claim under the ALSLA, Parker Poe argued that the trial court had properly dismissed the complaint.

As to Parker Poe's argument that it had provided legal services to the Fogartys, the Alabama Supreme Court pointed out that Parker Poe in arguing that no privity existed between itself and the Fogartys had expressly stated that it had not provided legal services to the Fogartys. The court explained "[t]he ALSLA applies only to allegations of legal malpractice, i.e., claims against legal-service providers that arise from the performance of legal services . . . ." [68] Thus, the court concluded that the ALSLA did not apply to the Parker Poe defendants because they expressly admitted that

no longer be covered by the ALSLA because their membership is no longer composed solely of Alabama licensed attorneys.

[68]     *Fogarty v. Parker, Poe, Adams & Bernstein, LLP*, 961 So. 2d 784, 788 (Ala. 2006).

Case 08-80072-JAC     Doc 256     Filed 12/03/09     Entered 12/03/09 13:56:31     Desc Main
Document          Page 26 of 42

they did not provide legal services to the Fogartys.  Unlike *Fogarty* where there was no attorney client relationship between the minority investors and the law firm representing the majority investors, plaintiff in this case specifically alleged in the Second Amended Complaint that an attorney client relationship existed between Powell Goldstein and Verilink and asserts claims for legal malpractice against same based on the legal services provided in this state. Thus, unlike *Fogarty*, an attorney client relationship clearly existed between Powell Goldstein and Verilink.

To the extent the *Fogarty* decision went further and rejected Parker Poe's argument that it was engaged in the practice of law in the State of Alabama, the licensing language is dicta because the case turned on the fact that the North Carolina law firm did not provide legal services to the Fogartys.[69]  As the Alabama Supreme Court explained in *Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800, 804 (Ala. 1991), the ALSLA simply does not apply to a claim against legal service providers when the claim "does not arise out of the receipt of legal services."

In *Cunningham,* the court refused to apply the ALSLA in a case filed by one legal service provider against another legal service provider arising out of a fee splitting arrangement because the wrong did not result from the performance of legal services.  *Cunningham* explained that it was apparent from the express statement of legislative intent included in the ALSLA, § 6-5-570, that by enacting the ALSLA the legislature "was attempting to provide a unified approach to those 'legal actions against legal service providers' that, if abused, could threaten 'the delivery of legal service to the people of Alabama and . . . the quality of legal services which should be made available to the citizens of this state' by forcing citizens to pay increased costs for legal services and decreasing the

---

[69]     *Id.* at 789 (stating that "it appears that the ALSLA applies only to attorneys who are licensed to practice law in Alabama").

27

availability of those services." [70]   The court concluded that the legal actions the legislature was concerned about were legal actions against attorneys in their professional capacities.  Given the Alabama Supreme Court's understanding regarding the unified approach that the legislature was attempting to provide legal actions against legal service providers, this Court believes that application of the ALSLA in this action furthers the statute's legislative purpose by extending coverage to an out-of-state law firm composed of Alabama licensed attorneys when the law firm enters this state and engages in an attorney client relationship with residents of this state which results in an injury occurring in this state.

 Plaintiff asserts that the Alabama Supreme Court's recent decision in *Wachovia v. Jones, Morrison & Womack*, 2009 WL 3064785 (Ala. 2009) supports its argument that the question of coverage under the ALSLA is not how many lawyers need to be admitted to the Alabama bar in a law firm for the firm to be covered but whether the lawyer whose conduct is at issue is licensed to practice in Alabama.  First, the Court notes that the plaintiff's argument ignores the fact that coverage under the ALSLA is not limited to licensed attorneys.   As the *Nelson* court plainly found, the ALSLA applies to law firms and support personal despite the fact that neither law firms nor support personal are licensed to practice law in the State of Alabama.

Turning to the facts of the *Wachovia* case, the court further notes that the *Wachovia* court was not faced with a situation like that before this Court in which an out-of-state law firm is composed of lawyers licensed to practice law in this state.  In *Wachovia*, the bank retained a Georgia law firm, Jones Morrison, to file an action against an Alabama resident who was mistakenly listed as a guarantor on a business credit card.  The Jones Morrison  firm associated the Mobile firm of

---

[70]     *Cunningham v. Langston, Frazer, Sweet & Freese, P.A.*, 727 So. 2d 800, 804 (Ala. 1991) .

Stokes Clinton to file suit on the debt, but before the suit was filed Wachovia instructed the Georgia

law firm to close the file and not proceed with the suit.  In any event, the Alabama law firm filed suit

in Alabama against the wrong person and obtained a default judgment against same.  When the

defendant later learned of the judgment, he sued Wachovia.  After Wachovia settled the case with

the defendant, Wachovia filed suit against both the Georgia law firm and the Alabama law firm.

On appeal, the Georgia law firm contended that because its attorneys were not licensed to

practice in Alabama, it was not acting as a "legal service provider" as defined by the ALSLA.  The

Alabama Supreme Court found that the ALSLA applied to the Georgia law firm even though the

firm did not have a single member of the firm licensed to practice law in Alabama because the firm

had formed a "joint venture" with Alabama lawyers and had agreed to assist them in the prosecution

of the Alabama lawsuit.[71]   Because the court found that the ALSLA applied based on the Georgia

law firms formation of a joint venture with an Alabama law firm, the licensing issue was not really

reached in *Wachovia*.  Interestingly, however, the court did note that Wachovia's stated claims

against the Georgia law firm arose "out of the attorney-client relationship that existed between [the

Georgia law firm] and the Bank and out of [the Georgia law firm's] provision of legal services to

the Bank."[72] Thus, the court concluded that the ALSLA governed the bank's claims against the

Georgia law firm.  Likewise, in the case before this Court, the plaintiff's claims against Powell

Goldstein arise out of the attorney client relationship that existed between Powell Goldstein and

---

[71]     *See also Terry Uniform Co., LLC v. Delong (In re Terry Manufacturing Co., Inc.)*, 358 B.R.
429 (Bankr. N.D. Ala. 2006)(finding that an attorney who engaged in the practice of law as counsel of record
in at least three separate cases in Alabama courts was subject to the ALSLA even though he was not licensed
to practice law by the State of Alabama).

[72]     *Wachovia v. Jones, Morrison & Womack*, 2009 WL 3064785 *27 (Ala. 2009).

Verilink and out of Powell Goldstein's provision of legal services to Verilink. Accordingly, the Court concludes that the ALSLA governs the plaintiff's claims against Powell Goldstein.

The ALSLA contains a two year statute of limitations and a four year statute of repose. Section 6-5-574 provides as follows:

> (a) All legal service liability actions against a legal service provider must be commenced within two years after the act or omission or failure giving rise to the claim, and not afterwards; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier, provided, further, that in no event may the action be commenced more than four years after such act or omission or failure, except that an act or omission or failure giving rise to a claim which occurred before August 1, 1987, shall not in any event be barred until the expiration of one year from such date.[73]

The plaintiff's pre-petition claims against Powell Goldstein as set out in the Second Amended Complaint occurred no later than the July 28, 2004, the date Verilink acquired Larscom, which is the date that triggers the statute of limitations and statute of repose under § 6-5-574. Regardless of when the statute of limitations expired, in no event could plaintiff assert a claim after July 28, 2008, which was the end of the four year statute of repose. Because the plaintiff did not file his claims against Powell Goldstein until September 29, 2008, two months after the statute of repose expired, plaintiff's pre-petition claims are time-barred.

---

[73]     ALA. CODE § 6-5-574(a).

**II.** **11 U.S.C. § 108(a) Cannot be Equitably Tolled to Provide Plaintiff with Additional time to File his Pre-Petition Claims Against Powell Goldstein Where the Applicable Statute of Repose Expired After § 108's Two Year Extension Period Expired.**

In its order dated July 31, 2009, the district court tentatively concluded that this Court's previous order granting Powell Goldstein's motion to dismiss plaintiff's pre-petition claims based on § 108 of the Bankruptcy Code was appropriate. In its subsequent memorandum opinion, the district court suggested that this Court may also want to consider the case of *Stanley v. Trinchard*, 579 F.3d 515 (5th Cir. 2009) to determine is relevancy on the limitations issues in this case. The district court made no further findings regarding §108. Section 108(a) reads as follows:

> (a) If applicable nonbankruptcy, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of–
>
> > (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> >
> > (2) two years after the order for relief.[74]

"Under 11 U.S.C. § 108(a), a trustee of a bankrupt may bring a suit either (1) within the regularly-applicable statute of limitations or (2) within two years of the order for relief if the regularly-applicable limit did not expire before the filing of the bankruptcy petition."[75]

The plaintiff asserts that the *Stanley* case is relevant because the Fifth Circuit found that § 108 applied to a statute similar to Alabama's statute of repose. In *Stanley*, the bankruptcy trustee brought legal malpractice claims against a law firm and attorneys who defended the debtor in a pre-

---

[74] 11 U.S.C. § 108(a).

[75] *Beck v. Deloitte & Touche, et al. (In re Southeast Banking Corp.)*, 144 F.3d 732, 736 (11th Cir. 1998).

31

petition civil rights action. The cause of action for legal malpractice arose of March of 2001, the debtor filed bankruptcy in October of 2001, and Louisiana's peremptive statute expired in March of 2002. The trustee filed the complaint in April of 2002 after the peremptive statute expired, but before the § 108 extension period expired in October of 2003. The district court granted summary judgment in favor of the attorneys finding that Louisiana's peremptive period, and not § 108, governed the estate's malpractice claim. The Fifth Circuit reversed finding that the malpractice claims were governed by § 108 rather than Louisiana's one-year peremptive statute.

The question before the Fifth Circuit was whether Louisiana's peremptive statute was somehow exempt from § 108 because of its status as a statute of repose.[76] The court of appeals concluded that the peremptive statute was not exempt from § 108. Section 108 is written broadly to extend any period fixed by applicable nonbankruptcy law within which a debtor may commence an action.[77] Because Congress drew no distinction among the state law vehicles that govern time limits for filing suit whether under a statute of limitations, statute of repose or peremption, the court of appeals concluded that the language of § 108 compels the conclusion that Congress expressly extended the time limit for pursuing any action that would otherwise be time-barred under state law.[78] The court of appeals concluded that § 108(a) of the Code extended Louisiana's legal malpractice peremptive period where the one year time period for filing the legal practice action expired after the bankruptcy petition, but *before* the extension provided by § 108 expired.

---

[76]     Similar to Alabama's statute of repose, a peremption period is a period of time fixed by law which must be exercised or same is forever lost.

[77]     *Stanley v. Trinchard*, 579 F.3d 515, 519 (5th Cir. 2009) .

[78]     *Id.*

The Court finds that *Stanley* is inapplicable in this case. In *Stanley*, the statute of limitation expired after the case was filed, but during the § 108 extension period. Unlike the fact scenario in *Stanley,* the statute of repose in this case expired after the case was filed and ***after*** the § 108 extension period. The ALSLA's four year statute of repose began to run on July 28, 2004, the date the Larscom transaction closed. When Verilink filed for bankruptcy on April 9, 2006, the applicable nonbankruptcy statute of repose had not yet expired. Under § 108(a) the trustee could have filed suit against Powell Goldstein before the *later of*: (1) the statute of repose which expired July 28, 2008; or (2) within two years of the order for relief (entered on April 9, 2006) which would have been April 9, 2008. Powell Goldstein was not added as a defendant until September 29, 2008, some five months after the extension expired. Accordingly, the pre-petition claims are time-barred.

Plaintiff contends that the two-year extension period provided in § 108 is subject to equitable tolling under *Young v. United States*, 535 U.S. 43 (2002)(considering whether the three-year look-back provision in § 507 of the Code can be equitably tolled) and the Eleventh Circuit case of *Ellis v. General Motors Acceptance Corp.,* 106 F.3d 703 (11th Cir. 1998)(considering whether the one year statute of limitation in the Truth in Lending Act can be tolled).[79] Plaintiff asserts that the egregious circumstances pled in the Second Amended Complaint regarding Powell Goldstein's conduct justifies equitable tolling. While the plaintiff has correctly cited *Young* and *Ellis* for the general proposition that equitable tolling should be read into every federal statute of limitations, the

---

[79] Plaintiff also cites the cases of *Boudin v. Residential Essentials, LLC,* 2007 WL 2023466 (S.D. Ala. 2007)(finding statute of limitations in RESPA was subject to tolling).

33

plaintiff has not cited any Eleventh Circuit or Supreme Court cases specifically holding that § 108 is subject to equitable tolling.[80]

The plaintiff has only cited two cases directly addressing whether § 108(a) is subject to equitable tolling. Plaintiff cites the cases of *In re Porter McCloud*, 231 B.R. 786 (D. Colo. 1999) and *Schwartz v. Pierucci*, 1985 WL 2831 (E.D. Pa. 1985) in which both courts found that the doctrine of equitable tolling prevented the application of the general two-year period on causes of action on which applicable nonbankruptcy law has not run as of the commencement of the bankruptcy case where the trustee is unable to assert a cause of action due to fraud or concealment by the debtor. Neither of these decisions are binding precedent. The Court further notes that the *Schwartz* decision was not a reported case and that the same court later found in a subsequent opinion concerning the same parties and issues reported at 60 B.R. 397, 399 (E.D. Pa. 1986) that the two year period under § 108(a)(2) had expired without further discussing the tolling issue with respect to § 108(a)(2). In *In re Porter McCloud, Inc.*, 231 B.R. 786 (D. Colo. 1999), the bankruptcy court examined the issue from the trustee's perspective as a lien creditor where the trustee was asserting a strong arm claim against a law firm under 11 U.S.C. § 544(a) and it was alleged that the law firm assisted the debtor in creating corporations which were used to effectuate the alleged fraudulent transfers the trustee sought to set aside. In this case before the Court, the plaintiff has brought a cause of action as successor to the debtor's interest in property under § 541(a) and, thus, his standing stems from the debtor. Accordingly, the plaintiff only "has standing to bring any suit

---

[80] *See Young v. United States*, 535 U.S. 43, 49 (2002)(explaining that "limitations periods are 'customarily subject to 'equitable tolling' . . . unless tolling would be 'inconsistent with the text of the relevant statute'").

34

that the debtor could have instituted when the debtor filed bankruptcy."[81] The conduct giving rise to the plaintiff's pre-petition claims against Powell Goldstein occurred prior to the closing of the Larscom transaction on July 28, 2004 and any knowledge the debtor had of those claims is imputed to the plaintiff.

Turning to the plain statutory text of § 108(a), the Court does not believe that equitable tolling would be consistent with the text of the statute, which provides that the trustee may commence such actions that the debtor could have commenced under applicable nonbankruptcy law if the period for commencing the action did not expire before the petition date "only before the later of– (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) two years after the order for relief."[82]  Subsection (a)(1) incorporates "any rule regarding tolling of statutes of limitation that would govern under applicable nonbankruptcy law."[83]  Because the statute already provides an extension of the time in circumstances under which state law would suspend or toll the running of the statute of limitations under § 108(a)(1), the Court finds that there is no reason to further expand the two year limitations period provided by § 108(a)(2), especially where applicable nonbankruptcy law provided the longer period for bringing suit under § 108(a)(1).  The extension period under § 108(a)(2) was not even applicable in this case because § 108(a)(1) provided the longer period for filing suit, hence, there is nothing to toll.  Further, the plaintiff's equitable tolling argument basically seeks an extension of an extension which must be denied.

---

[81]  *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006).

[82]  11 U.S.C. § 108(a)(2).

[83]  1-108 Collier Bankruptcy Manual, 3d Ed. Revised P 108.02.

Case 08-80072-JAC   Doc 256   Filed 12/03/09   Entered 12/03/09 13:56:31   Desc Main
Document      Page 35 of 42

The Court further notes that bankruptcy court's have held that "[u]nlike a statute of limitation which begins to run with the accrual of the cause of action, a statute of repose sets an outside limit as to when a cause of action may accrue in the first place. Equitable tolling is inconsistent with statutes of repose."[84] In *In re Maas*, 416 B.R. 767 (Bankr. D. Kan. 2009), the bankruptcy court recently explained that § 1325(a)(5)'s 910 car claim provision is not a statute of limitations, but is more akin to a statute or repose setting an outside limit for when the debtor would be liable for the full claim amount in bankruptcy. The court explained that the 910 car claim provision under § 1325(a)(5) enhances a creditor's rights for a period of time after the debtor files bankruptcy, but a bankruptcy filed more than 910 days after a vehicle is purchased does not cause the creditor to lose its rights under non-bankruptcy law. Because the 910 car claim provision expanded a car creditor's arsenal of rights beyond those it would have outside bankruptcy, the bankruptcy court found that § 1325(a)(5) could more aptly be described as a statute of enhancement which gives the car financier special treatment in a bankruptcy filed within 910 days of a vehicle purchase. Thus, the 910 day provision could not be equitably tolled. Similarly, in this case § 108 can be considered more akin to a statute of enhancement because it provides the trustee with an enhanced period of time to bring a cause of action. Thus, § 108 is not a statute of limitation and equitable tolling cannot apply.

---

[84] *In re Maas*, 416 B.R. 767, 771 (Bankr. D. Kan. 2009)(citing *In re Kohlhorst,* 2008 WL 2970391 (Bankr. N.D. Ohio, 2008) finding § 727(e)(2)'s one-year limit to revoke a debtor's discharge was more akin to a statue of repose than a statute of limitations)).

36

**III.   Although Plaintiff's Post-Petition Claims are not Time-Barred, the Court finds that Powell Goldstein's Motion to Dismiss the Post-petition Claims is Due to be Granted Because Plaintiff has not Alleged Legally Sufficient Damages to Support the Post-Petition Claims.**

To recover under a legal malpractice action in Alabama, a plaintiff "must prove a duty, a breach of the duty, that the breach was the proximate cause of the injury, and damages."[85]   Powell Goldstein cites the Alabama Supreme Court case of *Price v. Ragland*, 966 So. 2d 246 (Ala. 2007) for the proposition that the element of damages is lacking in this case.

In *Price,* the Alabama Supreme Court held that when an injury occurs outside the period of limitations governing legal malpractice actions, a plaintiff may not recover damages that were incurred within the period of limitations.  The claims against the attorney in *Price* arose after a closely held corporation redeemed a substantial percentage of its stock in 1986.  Prior to the stock redemption, T.O. Turner, Jr. owned 3,300 shares of the company's stock, his son Buddy Turner owned 612 shares, and the remaining 1088 shares were held in trust for T.O.'s other children.  When T.O. became incapacitated and needed a significant income stream to pay for his care, Buddy took over as president of the corporation and consulted with Price, the long time family attorney, who recommended that the corporation redeem a large percentage of its outstanding stock in order to generate income for the father's care.  In exchange for the stock redemption, the corporation executed promissory notes payable to the father and the children's trust.  The corporation entered into the stock redemption using a value of $500 per share.   In the purchase of the children's stock, Buddy acted in his capacity as attorney-in-fact for the father and as trustee for the children's trust and as president of the corporation.  After the stock redemption, Buddy became the sole shareholder of the corporation.

---

[85]     *Cribbs v. Shotts*, 599 So. 2d 17, 19 (Ala. 1992).

Case 08-80072-JAC   Doc 256   Filed 12/03/09   Entered 12/03/09 13:56:31   Desc Main
Document      Page 37 of 42

After the father died, his estate's executor hired Price to provide legal services for the estate. In 1994, the IRS disputed the $500 per share valuation of the corporate stock used for the redemption and took the position that the true value was $1,422.00. Price advised the estate's executor to contest the IRS' position. While Price provided legal services to the estate's executor, he also continued to provide legal advice to the corporation and to Buddy in both his individual capacity and in his capacity as the trustee of the children's trust. Eventually the estate agreed to settle with the IRS based on an amount of $665 per share.

Thereafter, the estate and the children's trust sued Price in November of 1996 alleging he committed malpractice in representing parties with conflicting interests when he represented Buddy and the corporation in the stock redemption. Plaintiffs also alleged that the attorney committed malpractice when he represented parties with conflicting interests in the IRS dispute and breached the standard of care in the IRS dispute by failing to advise plaintiffs of their option of seeking rescission of the stock redemption transaction.

A jury found Price liable for compensatory and punitive damages. The Alabama Supreme Court remanded and directed the trial court to grant Price's motion for judgment as a matter of law. While the claims arising from the 1986 stock redemption were barred by Alabama's four year statute of repose, the Alabama Supreme court found that the claims arising from the 1994 IRS dispute were not time barred. Plaintiffs suffered injury related to the IRS dispute as a result of Price's advice on November 22, 1994 when the attorney advised the estate, the corporation, and the children's trust to contest the IRS valuation. Hence, that action survived as the malpractice suit against Price was filed on November 12, 1996, i.e. within the four year statute of repose period. That aspect of the damages survived. However, the Alabama Supreme Court held that the malpractice action

concerning the advice by Price regarding the 1986 stock redemption was time-barred because same was not filed until after the four year statute of repose expired. Hence, the Alabama Supreme Court's basis for the remand and judgment as a matter of law for Price concerning those damages.

The Alabama Supreme Court concluded that the plaintiffs could not recover these damages because the damages arose from a wrong that occurred in 1986, and were thus outside the statutory time period. The court wrote:

> Evidence that damage continued within the statutory period from a wrong that first caused injury outside that period will not support an award of compensatory damages based on that wrong. Although the plaintiffs proved that they incurred loss-of-control damages within the statutory period, their claim based on that damage was untimely under § 6-5-574, Ala. Code 1975, because it was not proximately related to any injury within the statutory period that resulted from Price's malpractice in his work on the IRS dispute. [86]

Powell Goldstein asserts that plaintiff's post-petition claims seek the same damages as sought in pre-petition claims which this Court has determined above are time-barred. In paragraph 192 of plaintiff's Second Amended Complaint, plaintiff seeks damages for the pre-petition malpractice claims against Powell Goldstein "in no event less than the approximately $25 to $30 million dimunition [sic] in Verilink's fair value resulting from the Larscom acquisition including, but not limited to, the negative operating cash flow, assumption of liabilities and out-of-pocket acquisition costs." With regard to the post-petition malpractice claims, plaintiff argues that "[s]hould this Court accept either of the arguments asserted in PoGo's Motion to Dismiss that the instant claims are time-barred and judicially estopped, PoGo's breach of the standard of care will have been the proximate cause of the loss of the value of the pending claims, for which PoGo should

---

[86] *Price v. Ragland*, 966 So.2d 246, 262 (Ala. 2007)

Case 08-80072-JAC   Doc 256   Filed 12/03/09   Entered 12/03/09 13:56:31   Desc Main
Document   Page 39 of 42

be found liable."[87]   Essentially, plaintiff contends that Powell Goldstein's alleged post-petition malpractice caused plaintiff to lose the ability to assert a timely malpractice claim against Powell Goldstein in connection with the 2004 Larscom transaction and to recover damages for diminution in Verilink's fair value resulting from the pre-petition Larscom acquisition which this Court has determined is time-barred by Alabama's four year statute of repose.   Under *Price*, the plaintiff's claims for damages based on the diminution in Verilink's fair market value are not proximately related to any injury within the statutory period that resulted from Powell Goldstein's malpractice during the bankruptcy case.  Accordingly, the Court finds that although the plaintiff's post-petition claims are timely, same are due to be dismissed as a matter of law because plaintiff has not alleged legally sufficient damages to support the post-petition claims.  Plaintiff's failure to allege any new or independent injury as a result of Powell Goldstein's alleged post-petition malpractice which occurred inside the statutory period for filing an action mandates dismissal.   Powell Goldstein argues, and the Court agrees, that any other result would render Alabama's statute of repose meaningless.

## IV.    *In Pari Delicto*

Powell Goldstein further argues that the plaintiff's pre-petition claims should be dismissed for the additional reasons that they are barred by the doctrine of *in pari* delicto. The doctrine of *in pari delicto* is an equitable principle that provides "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing."[88] Under the "adverse interest" exception

---

[87]        Plaintiff's Second Amended Complaint, ¶ 275.

[88]        Black's Law Dictionary 806-07 (8th ed.1999).

to the doctrine, the imputation of wrongdoing by an agent (i.e. the former Verilink officers and directors) to the debtor-corporation will not occur if the agent was engaged in fraud or self-dealing entirely adverse to the corporate principal.[89]  However, the exception is narrow and only applies when the individual wrongdoer or agent has wholly abandoned any corporate purpose, even if the agent's purpose is misguided or even fraudulent to the point of ultimately causing the company's failure.[90]

Plaintiff asserts that while a corporation such as Verilink can only act through its agents who are charged with protecting it, their wrongdoing or knowledge of same cannot be imputed to the corporate principal where a jury could permissibly conclude that the agent was engaged in fraud or self-dealing adverse to the corporate principal.  Powell Goldstein counters that the plaintiff cannot establish the adverse interest exception to the *in pari delicto* defense because the former Verilink officers and directors were acting in furtherance of Verilink's business and were not wholly self-dealing.

The Court will not rule on this issue at this time as the Court has already found that the plaintiff's pre-petition claims are barred by the ALSLA's four year statue of repose and § 108(a).  As the Court is fully aware that this decision will be appealed, the Court will reserve this issue and address same if the case is remanded for trial.  In that event, Powell Goldstein would be free to renew the issue after the parties have completed discovery in this case.

---

[89]     *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1354-55 (11 th Cir. 2008).

[90]     *Id.* at 1354-55; *SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.,* 939 S. 2d 885, 905-906 (Ala. Civ. App. 2005).

41

## CONCLUSION

Based on the foregoing the Court finds that the ALSLA applies to an out of state law firm such as Powell Goldstein where the law firm is composed of members who are licensed to practice law in the State of Alabama; the law firm enters this state and engages in an attorney client relationship with the plaintiff; the law firm provides legal services in this state resulting in an injury in this state. Because the ALSLA applies to Powell Goldstein, plaintiff's pre-petition claims against the law firm are time-barred under ALA. CODE § 6-5-574 and must be dismissed. Tolling does not apply in this case to provide the plaintiff with additional time to bring the pre-petition claims. Plaintiff's post-petition claims must also be dismissed as plaintiff has failed to allege legally sufficient damages to support the post-petition claims.

**DONE and ORDERED** this date: December 3, 2009.

/s/    Jack Caddell
Jack Caddell
United States Bankruptcy Judge

42